Good morning, ladies and gentlemen. Our first case for this morning is CMFG Life Insurance against RBS Securities. Mr. Frederick. Thank you, Chief Judge Wood, and may it please the court. The district court committed two critical errors warranting reversal. First, the court erred in holding Kunis claims untimely under Wisconsin's six-year statute of limitations for contracts, rather than the discovery plus fraud period of six years. And second, the court misunderstood the multiple layers of disputed evidence on reliance in rendering summary judgment for RBS. I'd like to speak first to the timeliness question, because there's a clash really between the Wisconsin Supreme Court decisions that are on our side and a few district court opinions that they purport to claim on their side. If I could review briefly the Wisconsin Supreme Court decisions, it is black letter law in Wisconsin. Before you do that, as you do that, it would be very helpful for me if you were to somehow convey a line of development of the Wisconsin court's thinking in this area, because the briefs, not just yours, all of the briefs, you know, we're looking at 1906 cases, we're looking at cases decided very recently, and if the Wisconsin court is moving in a particular direction, I would like to know that. Sure, I'd be happy to address that. In fact, let me start, Chief Judge Wood, with that linear progression. In the early part of the 20th century, the Wisconsin Supreme Court confronted the issue of how to deal with fraud cases in equity, where there would be a claim for rescission, and normal fraud in tort. And when you're using the word fraud in your brief, we actually, at least at some point, we get the idea of what I think of as sort of actual fraud, willful fraud. And then the Yes, because in the 1920s, what this Wisconsin Supreme Court in the Peach case did was it held that fraud fits within the six-year discovery fraud statute of limitations provision. That is still good law, has never been overruled by the Wisconsin Supreme Court, and that is the leading precedent we would submit that you should adhere to in deciding the statute of limitations question. In the 1930s, the Wisconsin Supreme Court had questions about innocent misrepresentations and whether or not to apply the discovery plus six-year fraud statute of limitations. Which is the only difference between, I mean a huge difference for you, of course, but the only difference between .43 and .93, I think, is the discovery rule. That's correct. And that's pertinent here because all of the information that needed to be discovered about RBS's due diligence was in their files. It couldn't have been in ours. And so in the 1930s, in Gottschalk and Marine National, the Wisconsin Supreme Court held that fraud under Wisconsin law could be proved without Sancher. That's the innocent misrepresentation prong. With materiality, that was an added requirement. Correct. That's correct. Then if you fast forward into the 60s and 70s, and now I'm referring to the WHIP, W-H-I-P-P case, and the Knott case, what the Wisconsin Supreme Court did was it adopted the second restatement of contracts, which held that innocent misrepresentations that were material could be the basis for rescinding a contract. So if you look at that uninterrupted line of cases from the early 1900s all the way through the 70s, the Wisconsin Supreme Court has been absolutely consistent that you can have fraud be an innocent misrepresentation so long as it's material, and that that would fit within the fraud statute of limitations, which has had identical language, even though it's gone through several recodifications, but it has had identical language throughout that century-long period. Now the other side cites a couple of cases, but they are not on point. The In re Demos case was a pleading case. There the Wisconsin Supreme Court held that the allegations of fraud had not been adequately pleaded. It doesn't say anything about rescission. It doesn't say anything about how you would apply a case like ours to the discovery plus six in point ninety-three. The CLL Associates case doesn't address rescission, and then the district court cases that they rely on, Dairyland and Kinshaw, are distinguishable because Dairyland didn't involve fraud or misrepresentation. It involved unconscionability, and that case it's really important to read the whole thing because in that case what was going on was that there was a dispute between a supplier and a user of coal, and there was a provision in the contract that allowed for the reset of the pricing that the parties would agree to do if certain circumstances happened, and so the claim in the case was basically breach of contract, but there was also a claim that one of these provisions that didn't allow the reset of this price was unconscionable, and therefore they claimed an opportunity to either reform the contract, an equity argument, or to rescind it. So to pause for a moment on that, you would agree, I assume, that reformation, although equitable, is a contract remedy? I think that's right. Here, of course, we're not asking for reformation. We're asking for rescission. I understand. You make the argument that rescission is an extra contractual or off-the-contract remedy. Correct. And here, what we're talking about, and let's shift to the reliance point, is that Mr. Prusa, who was responsible for CUNA Mutual's decisions about where to invest these funds, which are used to support the 100 million Americans that are part of the credit union system, he had the decision about how to invest these monies. He had been involved in hundreds of mortgage-backed securities transactions. There was an important course of dealing, and if I leave you with nothing on this reliance point, I want to point you to A2348 in the appendix, because this is a letter that was submitted by the underwriters, Trade Association, to the SEC. What this letter does is it explains how the process worked, because the SEC was concerned about the speed with which these mortgage-backed securities were being bought and sold prior to full contract formation. What the industry argued to the SEC was, let people buy on term about the underwriters doing due diligence on these loans. The final documents are not going to be important to the formation of the contract. What's important is the term sheet and the course of dealing. And importantly, what the bank said to the SEC was, if there is a material change, and this is on page A2348, if there is a material change in the structure, can either reset the price or get out of the deal. The phrase is break the trade. And so it's absolutely crucial to understand that when Prusa was relying on what was going on in the industry, it was this understanding that the terms would be done on the basis of the trade issuances and the term sheets and the preliminary prospectuses, because the entire industry had convinced the SEC to allow it to operate this way. So I have to say, even if we were to find for you on the statute of limitations point, and that's just the difference between how many certificates there are, because there are some that are in anyway, the part that probably gives me the most concern about your side of this case is the reliance point. I mean, your opponents, of course, argue vociferously that Mr. Prusa never read anything, that he never relied on a thing, he didn't even have the preliminary prospectuses for quite a few of these deals. And I gather you're in a sense just making a point that they held themselves out as doing this spot checking and re-underwriting a certain sample of things and the other things that would assure one that it was a solid deal and that they had essentially said, we always do this, and there's no ambiguity about the word always. Is that your position? Chief Judge, I would develop the position even further. You have the outline of it, and let me try to fill in some more. There were oral conversations between Mr. Prusa and RBS traders in which these, and RBS officials in which these representations about due diligence were made. And did those all predate the certificates at issue in this case? That's right. But Your Honor, it's important to understand that what the underwriters like RBS were selling here was their reputation as sterling gold investment banks, sterling gold investment operations that would do the due diligence on these mortgage-backed securities. And so it would be odd to suppose that there would be individual variations among these deals because what they were selling was a volume business. They wanted to attract investors in large sums to buy these certificates because that was how they were going about making money by purchasing loans and then repackaging them. And so if there were individual deals in which there was a flat tire, so to speak, as you drove off the lot, that's going to be a black eye on the underwriter. So you use this term that I had never heard of before, and I feel like I've read something about this business, but scratch and dent? Yes. What's that? Well, scratch and dent deals are deals in which there hasn't been the kind of re-underwriting in due diligence so that the seller can't say, I've double-checked to ensure that the original loan underwriter, if you go to get a loan, has actually done the work to verify the borrower's ability to pay. I thought that the whole thing was, in maybe a broader sense, whether the original loan followed the originator's guidelines. Is that right? Both for borrower income, for loan-to-value ratios, for whatever else? That's right. And what RBS told its investors it was doing was re-underwriting that. Like a sample, right? That's right. And a statistically valid sample through which it presumably could assure itself that the entire loan package in the pool was going to be appropriate for investors. And it said that at trade presentations. It said that in its internal documents. It said that even in the final documents. Did Mr. Prussia ever say he was aware that they were out there trumpeting this around? Yes. His deposition is quite clear and his declaration is quite clear that he was aware of that. Where if the district court held him to fault, it was kind of like a debater point. You can't remember the specific date on which you heard a specific person say something that was fundamental to the operation of the entire industry. I mean, these are fundamental questions. Is the underwriter doing the due diligence to re-underwrite loans before packaging and selling them to the investment public? And so when Prussia testifies that he had done a hundred of these deals before he bought the first RBS deal, he was relying on the very course of dealing that the industry represented to the SEC in the letter that I gave you the citation for. This is how the industry works and we want it to work that way. And that's why these kinds of deals are not subject to a statute of frauds. These oral representations and these course of dealing issues matter to the way investors operate. And RBS knew that. The investors knew that. All the other underwriters knew that. The SEC knew that and tolerated that as a way to create liquidity in the home loan market. So I have two points. One of them is sort of a more specific one. The other is a general one. You've discussed the oral representations or the contacts that Mr. Prussia was having, I guess with Carruthers, but maybe with some other people. I'm not sure who else at RBS. And the record doesn't really have evidence of that. We don't seem to have emails or phone logs or anything like that, if I'm not mistaken. But the bigger point that bothers me about this is, you know, suppose everybody was just sort of rolling along and everybody assumed that companies like RBS were doing what they should be doing. Why does that relieve the buyer of the responsibility to nail things down a little better? Precisely because the way this was designed to work, Chief Judge Wood, was that if there were going to be differences, and this is where that passage on A2348 matters, if there were going to be differences in the form of practice, it was the underwriter's responsibility to tell the investor, things have changed. This deal is not going to be like all the other deals. There are going to be material changes, and they had a duty to tell Mr. Prussia. Why is it the underwriter's responsibility? Why isn't it caveat emptor, so to speak? Precisely because in federal law, these are strict liability claims. I mean, if you bring them fast enough under Sections 11 and 12 of the federal law. Well, it didn't happen here. No, it's true, and it's part because we couldn't discover the issues about due diligence in time to avail ourselves of the benefits of federal law. But that doesn't mean that we don't get the benefits of state law, where an innocent misrepresentation has caused us to undertake a contract that we want to get out of. We're allowed to do that under Wisconsin law. And the question here is, Prussia could remember everything. Everything he testified about substantively was correct. I remember being at trade conferences. That was verified. I remember what the RBS people told me. The RBS people said in depositions, yes, we said things like that. No one could remember the specific conversation. But the question is whether you're going to have reliance as a trap at summary judgment to allow a judge to say there's no dispute because the particular witness who's claiming reliance can't remember the very specific details where for years he was buying certificates in this market. So you're not relying just on sort of general reputational kind of things. I was dealing with a solid company, and I have the right to assume that what they're doing is on the up and up. There were actual, although he couldn't remember the dates and the specifics and the details, there were actual statements made by the defendant that your guy is saying that he relied on. That's correct. And they were both individual statements and statements at conferences and statements in materials that were sent to by RBS. And it was this whole menage, if you will, that the district court just said was basically legally irrelevant because Mr. Prussia couldn't remember the very specific, you know, I had a conversation with Chief Judge Wood, and she said something to me on such and such a date, and he couldn't remember that six or seven years after the fact. And the point here is all we're saying is that this is not an issue for summary judgment. It's an issue where the trier of fact ought to be able to eyeball Mr. Prussia, be subject to cross-examination and all the rest, but there to be a trial on whether or not there was justifiable reliance. Now, to be sure, there was a bench trial set up because this was equitable claims that we were asking for, but that's why we've asked the court to invoke Rule 36, because we think that the judge who spent a lot of time on this case, although there were no in-court hearings on it, has sort of prejudged what the facts are and has decided that the industry standard is not relevant and is not important information that ought to be taken into account. What about the fact that some of these commitments to purchase were before receiving any prospectus? So that Mr. Prussia, you want us to accept just because he went to a conference or because he read what he believed to be the trade practice, is that sufficient? No, the deals that you're talking about, he didn't get the final prospectus. He had gotten term sheets and preliminary prospectuses. Those term sheets, though, if you look at what the industry had asked the SEC to bless, was that we can have a contract based on the term sheet because of the course of dealing of the way this industry works for asset-backed securities. So what Prussia was relying on was I get the term sheet, I understand the basic gist of the deal, I understand what the course of dealing is, and I know that RBS has a duty to tell me if there will be any difference, any change, any material change. And there's no evidence in the record that RBS once went to Mr. Prussia and said, you know what, this deal is different. You relied on the term sheet, we're changing the deal. Never happened. And so to that extent, it is important to understand why this industry custom, this course of dealing, these practices pervaded the mortgage-backed securities underwriting system, and that's why Prussia's reliance is completely justifiable in light of the circumstances in which this particular transaction arose. And it's certainly sufficient to get to a trial. That's our point. So he has the base prospectus is what he has. Did he ever read that? Yes. I thought he said he did read it. He did, and it's testified, Chief Judge Wood, in his deposition, that he would spend two to four hours on every deal that he examined reading the materials and that he read all of the materials that were available to him. He said this was his custom. I mean, as you say, I mean, I guess with a hundred of these things, probably lots of fine print going by, he didn't remember that, you know, document number such and such was on my desk on this day. That's the problem, and I think the real issue for a trial judge is can you assess the person, evaluate his credibility in light of this other evidence, or are you going to just discount a big swatch of evidence and say it's legally irrelevant? Our position is that we're entitled to a trial on this issue of reliance. So the whole case really boils down to, again, if we put the statute of limitations to one side, what is the level of specificity of the evidence of reliance that you need to get to a trial? That's correct, and our position is that when you discount and you don't even consider all of the stuff about internal policy manuals, the depositions that were taken, emails that were internal, what the trade associations were saying, if you don't take that into account, the district court found this to be a simple case when in fact there's a lot of complexity to the layers of reliance, which is ordinarily, as you know, like materiality, a question for the trier of fact. It's not something where I would presume you routinely see reliance cases or materiality cases on summary judgment. If I could save the balance of my time for rebuttal, please. That would be fine, certainly. Mr. Pilmer. It pleases the Court. Good morning. Alex Pilmer for Defendant RBS. Mr. Frederick spent some time referring to a record site, A2438. 2348, I think. 2348. I may have wrote my numbers down. And he spent a fair amount of time talking about federal securities law and the Securities Act and the SEC's interaction with the securities industry, all of which might be pertinent if CUNA Mutual had brought a Securities Act claim. He didn't really talk very much about the Securities Act, I think, because I'm guessing the statute of repose had probably passed by the time they knew what was going on. And I think he consciously avoided mentioning that. In other words, so he didn't really spend that much time talking about it. But we spent a lot of time talking about the SEC letter, course of dealing in the industry, how these bonds are marketed, all of which might be relevant to those type of claims. But that's not the claim they brought. I don't get that. So why doesn't course of dealing matter? I mean, you're saying that you have to look at fraud on like a certificate by certificate basis. I'm not seeing how that makes sense. Absolutely. That's exactly what I'm saying. What I'm saying is that under the Wisconsin law for a claim for rescission based on innocent misrepresentation, the plaintiff has to show that the defendant made a material misrepresentation of fact on which the plaintiff actually relied. Most of what the authorities that CUNA Mutual relies on deal with justifiable reliance. Could they have justifiably relied on other statements? And that's not really the issue before the court. But are you saying that the misrepresentation of fact has to concern, in this case, the particular certificate? In other words, Certificate A-4752, I've done this on that, and if it doesn't concern that specific certificate, then you're out of luck? Is that your argument? Yes. And to be technical, each deal could have multiple certificates. So there's a deal called where CUNA bought multiple certificates. There were 15 certificates and 10 deals, right? Right. So RAMC 2005-4, CUNA bought two different certificates. There's one offering document for all of those. But to say that they want to rescind based on a misrepresentation of fact, it has to be a misrepresentation of fact about the RAMC 2005-4 deal. So if at time 1, the defendant says to the plaintiff, we always do our own due diligence, unequivocally, we always do our own due diligence, and then at times 2, 3, and 4, the plaintiff then buys these certificates and the defendant doesn't repeat that for each one, then the plaintiff is out of luck is what you're saying? Well, the nature of the alleged misrepresentation here was not based on representation of diligence. Maybe you could just first answer Judge Connelly's question. Exactly. Is it your position that if at time 1, somebody says we always do due diligence of this type and they don't repeat it each time, it's your position that they lose? That particular statement, I would say yes, they do lose for two reasons. One is the evidence in this record is we have no idea when that statement was made. Mr. Pruscia was very unclear about that. He could not recall when, who, what, where, and when pressed in deposition, he says, look, I don't really remember any specifics. I remember generalities. It was said to me at some point. I would submit that is not the type of misrepresentation of fact that could have been made 10 years prior to a deal that Mr. Pruscia bought in 2006. Or the prior effect could look at the record as a whole and say that RBS held itself out in the industry as a company that did this kind of re-underwriting of a sample of deals and that tried to make sure that the mortgages that were being packaged in each certificate were of a certain quality, etc. You don't think that's enough? You say, you know, this is the kind of company we are. We just always do these things. Again, I think that goes to justifiable reliance. Could Pecuni and Mitchell have justifiably relied on an actual representation that RBS made? In that circumstance, yes, that evidence would go to justifiable reliance. So then the question becomes could you prove those representations from RBS by circumstantial evidence as well as by some smoking gun email or something? Well, can you prove the actual representation to the plaintiff by circumstantial evidence? I suppose so, but the other thing to keep in mind here is that these are not ten uniform deals. Each one of these deals is specific to itself. So the first deal at issue chronologically is from an originator called AmeriQuest. Those are AmeriQuest loans originated under AmeriQuest program. There's another deal in here that is nothing but second liens. The representations of fact regarding those deals are specific to each of those deals. Fair enough, but I mean if there's admissible evidence that the defendant has said we do certain things in common on all of our deals, whether it's a second mortgage or a third mortgage or home equity loans or whatever, why wouldn't that be something that can be considered as a potential misrepresentation? Again, in this particular case it can't because there is no specific evidence of that. But that's a question of admissibility. So what you're saying then, so let me get to that. So what you're saying then is because he couldn't remember who said it or exactly when, it's not admissible evidence. I'm saying that it doesn't support the claim. It could be admissible for justifiable reliance. I don't understand the distinction you're drawing. The claim here is for misrepresentation of fact regarding compulsion. Let me ask it in a simpler way. So there's a trial happening and somebody asks Mr. Prussia, what did they tell you about this? Well, they told me that they always do their own due diligence. You get up on cross-examination and you say, when did they tell you that? I don't remember. Who told you that? I don't remember. Where were you when that happened? I don't remember. You then make a motion to strike the evidence. Do you win that motion or do you lose that motion? No, I don't make a motion to strike the evidence, but I make a motion that that's not an actionable misrepresentation. Okay, so it's not that it's inadmissible, it's that it's insufficient. Exactly, yes. And so the idea is that if you can't remember the details about it, it can't possibly constitute something that you're entitled to rely on. In this particular context, and we've cited cases that that type of statement is too vague. It lacks the specificity to support the notion that a rational, reasonable investor would rely on that in making a securities. As a matter of law. As a matter of law, yes. We have the, from the Second Circuit, the ECA case, we have from the, this circuit, Searles, it's not directly on point, but it talks about the specificity required of a representation in order to support a misrepresentation claim, and that statement, they did diligence, is not specific enough to support, as a matter of law, the rescission claim. So I guess the difference is really whether it's enough, maybe it's not enough in isolation, just to say we, at some point in the world, did diligence versus a statement, we always do diligence, and so there's no reason in this record to suppose that we didn't here, because I gather from, I mean, even you don't deny this, that it was standard practice in the industry to purchase these residential mortgage-backed securities based on term sheets. People weren't waiting for the final supplemental prospectus. They weren't digging back to, I mean, in fact, they didn't really, the buyers didn't have access to the originators of the underlying mortgages in the certificates. They would have had to rely on a consolidator, as it were, like RBS. True, and that's why there's actually a robust area of law under the Securities Act that would protect investors under certain circumstances if there were material misrepresentations of fact. But why is there such a, I mean, the securities laws, like many federal laws, build on a tradition of state common law. The states, Wisconsin in particular, has a law against, well, a law that says you can rescind a contract if there's been a material misrepresentation of fact. So why doesn't that underlie all of this? You're saying Wisconsin law doesn't really protect this kind of innocent but material misrepresentation of fact. Well, I'm saying that Wisconsin does recognize a claim for rescission based on an innocent misrepresentation of fact, and that's the claim that CUNA brought. So we need to look at the elements of that particular claim. And so what does Wisconsin say about reliance on course of business? You know, somebody does business with a bank, and they don't bother to ask whether it's insured by the FDIC, but everybody, they say, we've always been insured by the FDIC. So they're relying on that, even if the bank, for some reason, let the coverage lapse. The course of dealing cases that CUNA Mutual relies on are contract interpretation cases. And one of those cases they cite even in reply, the Tufale case, the church's chicken case. They actually cite the dissent without calling it the dissent for the proposition that they could rely on a course of dealing. The majority in that case actually held that no, course of dealing conduct was not relevant in that case. And that was the Wisconsin Supreme Court. But there's a huge body of law, both inside contracts and beyond, that says in commercial cases course of dealing is relevant. It's relevant for contract interpretation, and that's my point, to interpret ambiguous provisions in a contract. And CUNA does not point to any ambiguous provisions in any of the offering documents. Actually, I think this case may be about what was being offered, what were the terms, and did the terms include representations that due diligence had been performed, or maybe the particulars of due diligence? I would disagree with that, Your Honor, because the claims involved here are an alleged misrepresentation in an offering document about compliance with underwriting guidelines or loan-to-value ratios. And there's no evidence that the plaintiff actually read any of those, and there's no case that stands for the proposition that when you have to prove actual reliance, you can prove that when you didn't actually read the document. But they relied on the fact that RBS says we're a company in good standing. They're relying on RBS's reputation. Now, you're saying they were foolish to rely on RBS's reputation since it had a bad one. No, no, no, I'm not saying that at all. I'm saying that, yes, they may have relied on a reputation for a good reputation. Well, and for performing these steps every time, as RBS itself said in all these PowerPoints and various presentations. By the way, PowerPoints that the plaintiff never saw, never received, didn't see until the lawyer showed it during the deposition. So, again, that couldn't form the basis of his reliance to actually buy the suggestion. But if he says he was at presentations where that happened and then it just happens to be true because there are PowerPoints that show that there were things where that happened. That's just not what the record is. He said he went to conferences. He couldn't remember specifics. The PowerPoint presentations were specific for different investors. We turned them over in discovery because we had to. They were not PowerPoint presentations that were given at conferences. Can I go back to your point for a second about course of dealing? And you were making the point that it's the cases that the plaintiff cites are only about interpreting a contract. So let's stop calling it course of dealing. Let's call it habit. Yes. So why doesn't this come in as habit evidence? And this court's decision in simplex is right on point. To be admissible habit evidence, you have to have a specificity of conduct. The specificity of conduct is we always do our own due diligence. This is what we tell you. We always do our own due diligence. And even though you told me that back here and you didn't tell me that right before I bought this contract, that's evidence of your habit because you're saying this over and over again. Well, that may be evidence of RBS's habit practice. But we're talking about can habit practice prove reliance? Can Mr. Prusci say my habit was to read these documents? No. Can Mr. Prusci say can I say that I knew that that was what RBS was doing and thus after I reviewed the term sheets and knowing what the base prospectus said, I was comfortable taking the next step and buying because I knew that RBS always does its own due diligence. And what that demonstrates is that he's not actually relying on any of the misrepresentations that CUNA alleged in this case. They allege specific misrepresentations in offering documents. And that hypothetical is basically, yeah, I didn't rely on that. I was relying on my assumptions about what RBS was going to do based on what they had said. But wasn't, isn't there just one step further, which is that RBS said it was going to do due diligence and in fact didn't and so the certificates themselves were false? I should say not false. Were misleading? Were misrepresenting? Again, there has to be some specific misstatement, misrepresentation of fact in an offering document that the plaintiff relied upon in order to rescind. And they're not pointing to any specific misrepresentation. So you think oral or implicit misrepresentations don't cut it? It's got to be in black and white on a piece of paper? It's conceivable that oral misrepresentation could support a claim. That's not what CUNA Mutual alleged in this case. They came in very, very late after multiple times of being struck down because their original pleading was proved false to then say, well, there was an oral representation about diligence made sometime in the last 10 to 15 years. And Judge Conley specifically addressed that and said that's not specific enough to support a misrepresentation claim. On habit and practice, though, the habit and practice that is relevant is, could Mr. Prusa and CUNA Mutual prove actual reliance through his habit and practice? And his habit and practice actually relies on it. Actually, that wasn't the point I was making. I understand. The point I was making is that they're offering it as evidence of RBS's And then Mr. Prusa or Prussia or whatever it is is saying, I relied on the fact that you had that habit and practice of doing things. Because he certainly said that, right? He testified. I relied on the fact that it was their habit and practice of doing these things. He did say that he relied on RBS's representation or status as a resident. I'm not talking about this being admissible as his habit and practice. I'm talking about it as being admissible and sufficient at least to get to a And I understand. That could be. But then there's no evidence of Mr. Prusa's actual reliance on any of the alleged misrepresentations. Could you give an example of one of the ones that you're talking about at this point, the particular misrepresentations that you would like us to focus on? In the, sure. So just give me one second. In the prospectus supplements that are what CUNA alleged to have been false, there are multiple representations that are made. These are very long, as your Honor noted, dense legal documents. So let's take one of the deals called Soundview 2005-B. That's at RA 105. Actually, that's a Penn site. That supplement is much, much longer. In that particular case, that deal, there were seven disclosed originators. So seven different loan originators' loans went into that particular deal. Their underwriting guideline descriptions, the ones that CUNA Mutual alleged to be false, cover 13 pages. And they're dense. And I can't actually cite them all to you, but they're dense. Please don't read them. That's at RA 110-23. But the underwriting guidelines descriptions only cover three of the originators, Countrywide, Long Beach, and New Century. In those descriptions, there is a representation that says on one level, the loans, and I'm going to summarize this, will generally comply with the underwriting guidelines. But then it says it is expected that a significant number of the countrywide loans will have been originated based on underwriting exceptions. An exception means that it does not comply with the underwriting guideline. So CUNA Mutual, throughout its briefing in this case, has suggested that there's an ubiquitous disclosure that all loans comply with underwriting guidelines. And that's just not true at all. The disclosures are specific for each deal. So that's the SoundView 2005-B deal. Let's look at another deal called MMLT 2005-3. You can find that at RA 28. That's a deal where there's only one originator called Meritage. And there's only two and a half pages of descriptions of the actual loan guidelines there. So it's a much different description, a much different type of representation about underwriting guidelines. And that deal says, after saying that these are generally the guidelines, it says, quote, it is not expected that a significant portion of the mortgage loans would represent exceptions. So I just took two deals here. But my point is that every single offering document is unique. You cannot say that one set of offering documents is the same as another set of offering documents. It's not enough to say I relied on RBS telling me 10 years ago that they did diligence, therefore I don't have to read any of the offering documents in order to have a claim for rescission. So, I mean, another way of looking at it, I mean, I see that these are very helpful. Thank you for these examples. You know, as maybe under proper instructions, or not instructions because it's to the court, but under a proper view of the law, CUNA might prevail on some and not on others. I could imagine that. If he actually read any of the misrepresentations. And I would also go back to reliance. But this is back in the prospectus supplement. So this is beyond the question of this course of dealing of RBS or habit, if you will, There's not a recognized claim to say I bought these 15 certificates because at some point in the past, and I can't remember when, RBS told me that it performed diligence on all deals. Well, and that RBS said, and that I knew as a member of the industry, that RBS markets certificates that comply on the whole and by and large with loan underwriting guidelines. If 90% of these were junk, you know, were the lowest tier, so to speak, you would expect some disclosure of that. These tiers got sold at different prices. There's no claim that there was a misrepresentation about the tier. So the deal that I just told you about, MMLT 2005-3, Mr. Prusa bought the B1 certificate. That's pretty low on the tiers. The Soundview 2005-B, he actually bought two certificates, one of which was called the M10. It's the lowest in the tranche, just below junk status. There is no claim whatsoever that he didn't know exactly what he was buying. He intentionally bought the ones that were down by junk because they provided a higher yield. Right. Can I go back to what you said earlier about the proposition? If you didn't actually read anything, you can't rely on this whole course of dealing. So how do you deal with Bank of Sun Prairie versus Essar, which seems to say the opposite, at least as I read it seems to say the opposite. So the failure to read cases, and that is one of them, recognizes certain circumstances where there's a written contract and the plaintiff wants to rely on an oral representation that's outside of that contract and is inconsistent with that contract. I think that one was there was a loan to, it was guaranteed. It was about the guarantee, right. And the woman who gave the guarantee thought she was only guaranteeing the payment for a truck and it turns out she was guaranteeing more. That's a different set of cases, and those are really dealing with justifiable reliance in what circumstances. Which is what you said this whole thing about vague representations was about, by the way. Well, I do believe that the oral representations that Mr. Prusha and Kinamitra are discussing about diligence at most go to justifiable reliance. They don't go to actual reliance. The failure to read cases are all about justifiable reliance. Can a plaintiff justifiably rely on an oral representation outside of a contract? And in that case, what's critical is that there's no dispute that she actually heard, received, and relied on that oral representation. And there's a dispute in this case? There's no dispute that Mr. Prusha did not actually read, review, rely on the prospective supplement. There's a dispute about the oral representation. So you're saying, are you saying that the difference between ESSER in this case is that in ESSER there wasn't any dispute about the oral representation and in this case there is? No, I'm not saying that. What I'm saying is that the actual claim that Kinamitra brought here is a claim for misrepresentation in offering documents and there is no dispute that Mr. Prusha did not read, review, rely on those offering documents. They provided no evidence of that. Is their claim, I guess I'll just ask Mr. Frederick this too, but is their claim misrepresentations in offering documents or is it misrepresentation in offers? Well, their claim shifted over the course of this case before the district court. I know that, as did the defenses. I understand, and that's not that uncommon. And Judge Connolly addressed this head-on. Did they plead a claim for rescission based on an oral representation? And Judge Connolly said, no, you did not plead that. That was not in there. The only thing about diligence representations that you put in your complaint was that you were trying to use that at first when he was going to dismiss the claim on the basis of certain statements in the offering documents. Then Kuna alleged, no, no, there were specific oral representations made about diligence on each particular deal. Then Mr. Prusia testified, no, there were no such representations about each deal. It was not until opposition to summary judgment that they raised this issue of there's an independently actionable oral representation. And on that, this is kind of where we were a few minutes ago. That's not actionable. It's too vague. It doesn't have the specificity. Judge Connolly said really the misrepresentation evidence has to go to support or if there's lack of it, not support, your other claims, your claims about the particular misrepresentation. So it's in the case. It's just in the case from an evidentiary point of view on other things. Exactly. Yeah. My red light just went on.  Let's see what Mr. Frederick has to say on the bubble. Let me start with the Bank of Sun Prairie case because it would seem odd that the Wisconsin Supreme Court would have a rule that if you had not read the contract and it was inconsistent with the writing, you can nonetheless rely on that representation. We're here. Every bit of evidence that we have, their internal documents, what they said in public, and what Prusha remembered, all said the same thing, which is that RBS did due diligence on these loans. But is that a little bit of an after-the-fact thing? So here's Prusha saying, I knew what RBS was going to do. But the evidence doesn't get pinned down terribly well as to why he knew that, or maybe that's what we're talking about. And so even though they did it later, why does that feed back and say he relied? Because the reason why he knew that was because that's how the industry worked. That's what all these underwriters were out there telling everybody. You can make this deal on the term sheet because this is course of dealing. Your hypothetical about the banks and the FDIC insurance is exactly what we're talking about here, and it was their duty to tell investors this one is different, and they never did that. So Mr. Pilmer's point, at least part of his point, seems to be that that's all too vague in general to be something that you can really rely on. What's the case, or what are the cases that say he's wrong about that? Well, I think that Bank of Sun Prairie is the best because what it says is that the legal standard is the totality of the circumstances for judging reliance, and there I would submit that if the evidence, the external evidence, is consistent with the memory of what he relied upon, it surely is sufficient under the legal standards in that case. And let me point you to a reply brief on page 9 where their evidence, their representation, was that, quote, RBS followed consistent strategies for due diligence across more than 100 RMBS deals worth $132.5 billion and that RBS's policy required that due diligence procedures are performed for all asset-backed transactions. So I gather that part of what he's saying, though, is that Mr. Prusha said he didn't remember ever reading that or something like that. Well, these are their internal operating... All we're saying is that to support the point you were making, RBS's habit and custom and practice was to do this due diligence, and they told people in the industry, we're doing the due diligence, so you can have your traders go out there and tell investors like Mr. Prusha, we're going to back you up, we're going to do the due diligence on these deals. And that's what Prusha remembered. Now, the fact that he couldn't remember the specific conversations I don't think is a question for summary judgment. The question is whether, in light of all the evidence, it is reasonable to suppose that he spoke credibly when he said, I relied on the way this worked and what RBS told me. And all the evidence so far has been consistent that what Mr. Prusha remembered substantively was true. Mr. Frederick, if Mr. Prusha followed the approach you suggested and he made his first initial purchase, would he have to do anything more than pick up the phone for any subsequent ones? If he's relying on this industry practice and RBS representation, is he just free to call Harry or Sam or whoever he talks to and say put me in the next deal at X level and do nothing? Read nothing? Sign nothing? I think our case is harder if that happened. But I actually think that that's probably the correct statement of the way the industry worked because these deals, I know you're shaking your head like, this is why we had a financial crisis in 2008. But that's what happened to the country. I understand that. And it's because they sold the SEC on this is the way the industry ought to work because we want to get these things peddled as quickly as possible. But I take it the hypothetical means he doesn't even read the term sheets. That's what I'm saying. I think that under the Wisconsin Supreme Court case, the Bank of Sun Prairie case, you look at that as a totality of the circumstances. Could a trier of fact decide, hey, that's just not enough evidence? I would concede that that might be possible. No, I'm not questioning the premise of your lawsuit. I'm just questioning where we're going to go in this type of litigation if we establish the hypothetical I posed to you is sufficient to carry it today. And I think that to answer your question further, it really does depend on the specificity of what the industry representations are about what it's doing. Those are pertinent background facts to determine whether or not somebody's reliance is reasonable. Thank you. All right. Thank you very much. We appreciate the assistance of both counsel in helping us wade through this enormous record. And we will take the case under advisement.